ACCEPTED
03-14-00654-CR
6140740
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/20/2015 3:29:52 PM
JEFFREY D. KYLE
CLERK

NO. 03-14-00654-CR

IN THE COURT OF APPEALS
FOR THE
THIRD SUPREME JUDICIAL DISTRICT OF TEXAS
AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
7/20/2015 3:29:52 PM
JEFFREY D. KYLE
Clerk

NO. D1-DC-14-904021

IN THE 427TH DISTRICT COURT
OF TRAVIS COUNTY, TEXAS

JAMES PALACIO,
APPELLANT

V.

STATE OF TEXAS,
APPELLEE

APPELLANT'S BRIEF

ORAL ARGUMENT REQUESTED

LINDA ICENHAUER-RAMIREZ
ATTORNEY AT LAW
1103 NUECES
AUSTIN, TEXAS    78701
TELEPHONE:    512-477-7991
FACSIMILE 512-477-3580
EMAIL:   LJIR@AOL.COM
SBN:   10382944

ATTORNEY FOR APPELLANT

# TABLE OF CONTENTS

**PAGE**

Parties to Trial Court's Final Judgment.......................................................3

Index of Authorities.................................................................................4

Statement of the Nature of the Case ........................................................5

Statement of the Point of Error................................................................7

Statement of Facts...................................................................................8

Summary of the Argument .....................................................................22

Point of Error Number One ....................................................................23

Prayer for Relief ....................................................................................32

Certificate of Compliance.......................................................................32

Certificate of Service .............................................................................33

# PARTIES TO TRIAL COURT'S FINAL JUDGMENT

In accordance with Tex.R.App.Proc. 38.1(a), Appellant certifies that the following is a complete list of the parties and their counsel:

(a) the State of Texas represented by:

Ms. Kelly A. Gier, Assistant District Attorney
Travis County District Attorney's Office
P.O. Box 1748
Austin, Texas 78767

Mr. Efrain De La Fuente, Assistant District Attorney
Travis County District Attorney's Office
P.O. Box 1748
Austin, Texas 78767

(b) Mr. James Palacios represented by:

Mr. Leonard Martinez – trial attorney
Attorney at Law
812 San Antonio, Suite 104
Austin, Texas 78701

Mr. Brad Urrutia – trial attorney
Attorney at Law
P.O. Box 252
Manchaca, Texas 78652

Mr. Richard Estrada – trial attorney
Attorney at Law
1501 Newfield Lane
Austin, Texas 78703

Ms. Linda Icenhauer-Ramirez - appellate attorney
Attorney at Law
1103 Nueces
Austin, Texas 78701

3

# INDEX OF AUTHORITIES

**CASES**                                                                     **PAGE**

Brooks v. State, 323 S.W.3d 893 (Tex.Cr.App. 2010) .............................. 25

Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ................................................................................... 25

Thomas v. State, 875 S.W.2d 774 (Tex.App.-Beaumont 1994, pet. ref.) ...................................................................................... 24

Villarreal v. State, 716 S.W.2d 651 (Tex.App.-Corpus Christi 1986, no pet.) ................................................................................ 31

**STATUTES**

V.T.C.A. Penal Code, Sec. 1.07(a)(17) ...................................................... 24

V.T.C.A. Penal Code, Sec. 1.07(a)(17)(B) ........................................... 24, 28

V.T.C.A. Penal Code, Sec. 1.07(a)(46) ...................................................... 24

V.T.C.A. Penal Code, Sec. 22.01(a)(1) ...................................................... 23

V.T.C.A. Penal Code, Sec. 22.02(a)(2) ................................................... 8, 23

**COURT RULES**

Tex.R.App.Proc. 38.1(a) .............................................................................. 3

TO THE HONORABLE JUDGES OF SAID COURT:

COMES NOW James Palacios, appellant in this cause, by and through his attorney and files this his brief on original appeal.

## STATEMENT OF THE NATURE OF THE CASE

Appellant was charged by indictment in this cause on May 15, 2014. The indictment alleged that appellant committed the offense of aggravated assault (family violence) with a deadly weapon. It also contained one enhancement allegation alleging that appellant had a prior felony conviction for burglary of a habitation. (C.R. 5-6) Jury selection occurred on September 22, 2014. (R.R. VI, pp. 4-231) On that same day, appellant entered a plea of not guilty. (R.R. VI, pp. 238-239) On September 25, 2014, after hearing the evidence and the argument from counsel, the jury deliberated and returned a verdict of guilty of the offense of aggravated assault. (R.R. IX, pp. 5-6; C.R. 141-147) On September 26, 2014, after hearing the evidence and argument from counsel, the jury found the enhancement allegation to be true and assessed appellant's punishment at thirty (30) years imprisonment. (R.R. X, pp. 148-149 C.R. 151-153) Appellant was sentenced that day. (R.R. X, pp. 150-151; C.R. 158-159) A motion for new trial was filed by trial counsel on September 26, 2014.[1]

_____

[1] Trial counsel also filed a pleading entitled "Motion for New Trial and Motion in Arrest

(C.R. 149)   Notice of appeal was filed by trial counsel on September 26, 2014.[2]   (C.R. 148)   The trial court's certification of defendant's right to appeal was filed on September 26, 2014.   (C.R. 157)

---

of Judgment" on October 2, 2014.   (C.R. 162-175)

[2] Appellate counsel also filed a notice of appeal on October 6, 2014.   (C.R. 176-177)

## STATEMENT OF THE POINT OF ERROR

**POINT OF ERROR NUMBER ONE**

**THE EVIDENCE IS INSUFFICIENT TO SUPPORT APPELLANT'S CONVICTION FOR AGGRAVATED ASSAULT BECAUSE THERE WAS NO EVIDENCE THAT APPELLANT USED A DEADLY WEAPON.**

## STATEMENT OF FACTS

The indictment in this case alleged that appellant committed the offense of aggravated assault with a deadly weapon (family violence) and specifically alleged that appellant:

> "on or about the 30th day of January, 2013, . . . , did then and there intentionally, knowingly, or recklessly cause bodily injury to Nicole McKee, a member of James Palacio's family or household and with whom James Palacio had a dating relationship, by striking Nicole McKee with his hand, and by pushing Nicole McKee with his hand, and by grabbing Nicole McKee with his hand, and by grabbing Nicole with his arm, and by pushing Nicole McKee with his body, and by striking Nicole McKee with his body, and by causing Nicole McKee to fall to the ground, and James Palacio did then and there use or exhibit a deadly weapon, to-wit: a hand, an arm, a body, and the ground, which in the manner of its use or intended use was capable of causing death or serious bodily injury, during the commission of said offense, " (C.R. 5-6)

V.T.C.A. Penal Code, Sec. 22.02(a)(2). The indictment also contained an enhancement allegation that appellant had a prior felony conviction of burglary of a habitation. (C.R. 5-6)

The evidence showed that emergency personnel were dispatched to a trailer home in Mustang Ridge, Texas around 1:41 p.m. on January 30, 2013. They found the complainant Nicole McKee unconscious and in cardiac arrest. The first responders performed CPR on the complainant and initiated other life saving measures. When they detected a pulse, they

8

stabilized her and transported her to a hospital in Austin. The first responders noticed that the complainant had numerous black and blue bruises all over her entire body. (R.R. VI, pp. 248-267)

Appellant was trying to administer CPR to the complainant when the first responders arrived. After the complainant was taken to the hospital, appellant was asked by law enforcement if he would be willing to give a voluntary statement to detectives with the Travis County Sheriff's office. Appellant agreed and was given a courtesy ride to the sheriff's office by a Mustang Ridge police officer. (R.R. II, pp. 7-12) When appellant arrived at the sheriff's office, he was told by Detective Jim Anderson that he was not under arrest and that he was free to leave at any time. Appellant agreed to talk to the detective and gave a lengthy interview to Detective Anderson and Detective Alan Howard, which was recorded and introduced into evidence at the trial as State's Exhibits 5 and 6. (R.R. VII, 30-34) Appellant told the detectives that he had been in a relationship with the complainant for several years and that they had a daughter together. He told the detectives that the complainant was a heroin addict and that she had come to his home three days earlier (Monday). Initially, appellant told the detectives that the complainant had had bruises on her when she arrived at the house on Monday. Appellant also told the detectives that he never

assaulted the complainant but that he had restrained her by grabbing her wrists and shoulders when she tried to leave in order to go get more heroin. When the detectives asked appellant about how the complainant received some of the bruises, he told them that the bruises on the front of her legs occurred when she fell outside on the gravel in the driveway. He said she got a bruise on her forehead when she passed out and fell. He said that the bruises on her chest occurred when he tried to restrain her. Appellant told the detectives that he was unable to keep her from leaving the house and that she in fact left the house. As the interview progressed, appellant began changing portions of his story. He admitted to the detectives that when the complainant had arrived at his home on Monday, she did not have any bruises. He admitted that at one point when the complainant was kicking and screaming and he was trying to restrain her, she fell down and he fell on top of her. Appellant told the detectives that he was 6'4" and weighed approximately 198 lbs. He repeatedly told the detectives that he never hit the complainant but he admitted that he might have held her too tight. He did say that at one point they were fighting over a knife and the complainant cut herself on her fingers. When the detectives asked about the multiple bruises on the back of the complainant's legs, he told them when he was trying to get her into the shower, she fell and landed on the

metal shower door railings. He also changed his story and admitted that the complainant had stayed at the house all day Monday and Tuesday. Appellant told the detectives that in order to get the complainant off of heroin, he got morphine, narcan and promethazine pills from his grandmother and over the course of the three days, gave her a lot of pills. Appellant told the detectives that he had given the complainant ten narcan pills, ten morphine pills and ten promethazine pills on Monday, ten morphine pills and ten promethazine pills on Tuesday and ten more morphine pills and ten more promethazine pills on Wednesday. He also admitted to the detectives that he bought twelve grams of crystal methamphetamine and had allowed the complainant to eat it over the course of two days. He told the detectives that he had flushed the remaining methamphetamine down the toilet before authorities arrived because he did not want to get arrested for drug possession. According to appellant, the complainant was in a lot of pain and she told him that she would overdose on heroin if he did not give her the other drugs. Appellant told the detectives that by the third day, the complainant was hallucinating. He insisted that he was just trying to help her get off heroin. (State's Exhibits 5 and 6) (R.R. VII, pp. 39-40, 87-92) After the interview at the sheriff's office concluded, the detectives asked appellant if they could go to

his home and see where the complainant had been injured and speak to his mother. Appellant agreed. Everyone drove out to the trailer where appellant lived with his mother. While Detective Anderson spoke with appellant's mother, Detective Howard had another conversation with appellant that he also recorded. (R.R. VII, pp. 45-46, 92-96) During this conversation, appellant showed the detectives the different areas of the house and yard where the complainant had been injured. This included the bathroom and outside the back door of the trailer. Appellant told the detective that at one point he and the complainant fell out of the back door way of the trailer. He said that he fell on top of the complainant and they ended up on the ground. He told the detectives that he felt that he broke something on the complainant when they hit the ground. When he fell down his elbow went up into her chest and he thought he felt her ribs move. He said that the complainant gasped and then began having trouble breathing. (State's Exhibits 20B[3]) (R.R. VII, pp. 96-104; R.R. VIII, p. 5-7)

Detective Anderson testified that a hand in the manner of its use could be capable of causing death or serious bodily injury. He also testified to

---

[3] The audio recording of Detective Howard's conversation with appellant at the trailer was originally introduced as State's Exhibits 20 and 20A. (R.R. VII, pp. 95-96) The State later consolidated State's Exhibits 20 and 20A into State's Exhibit 20B and substituted State's Exhibit 20B for State's Exhibits 20 and 20A. (R.R. VIII, pp. 5-7)

the same thing with respect to an arm, a person's body and the ground. (R.R. VII, pp. 60-61)

The State also brought in several witnesses who knew appellant and the complainant. Hector Rocha testified that he was an assistant manager at the Sonic Drive-In on William Cannon in Austin. He testified that the complainant worked there as a car-hop. On her last day of work on Sunday, January 27, 2013, the complainant came to work but seemed distracted. When she continued to be on her phone, he sent her home three hours into her shift. She never came back after that day. Rocha testified that the complainant did not look ill that day and seemed physically capable of performing her job duties. (R.R. VIII, pp. 9-19)

Dr. Satish Chundru from the Travis County Medical Examiner's Office testified that he performed an autopsy on the complainant on January 13, 2013. He testified that she was 5'3" tall and weighed 143 pounds. He told the jury that his external examination revealed that the complainant had quite a few bruises that seemed to be a day or two old. He found bruises on her midchest area that looked to be within a day or two old. He testified that they did not appear to have resulted from CPR being performed but it depended on how the CPR was done. (State's Exhibits 35, 45 and 46) (R.R. VIII, pp. 72-79, 82-83) He found bruising on the complainant's

right eyelid, which had resulted from marks higher up on her forehead. He also noted a light yellow bruise above her right eyelid and a yellowish bruise on her forehead. He noted a faint red bruising on the left side of her face and he estimated that this was less than a few days old. (State's Exhibits 37, 38, 40, 41) (R.R. VIII, pp. 80-82) The doctor also pointed out a lot of bruising on the complainant's arms and wrists, a bruise near her pubic area, a lot of bruising on the complainant's left side, an abrasion and bruising on her posterior right shoulder, bruising on her hands, some cuts on her right hand, a fractured finger on her left hand, bruising on her knees and shins and bruising on the back of her thighs and calves. (State's Exhibits 43, 44, 49, 50, 51, 53, 54, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71) (R.R. VIII, p. 82-90) An internal exam revealed that the complainant had suffered multiple fractures of her ribs on both sides of her body. The doctor testified that the rib fractures on the left side of the complainant's body corresponded with the bruises found on the exterior part of her body. He also testified that although CPR could have caused some of the rib fractures, it did not cause all of them. He described the fractures as pretty severe and told the jury that after her ribs had been fractured, the complainant would have had trouble breathing and would have been in a lot of pain. He also testified that cracked ribs could be life-threatening.

14

(State's Exhibits 74, 75, 76)    (R.R. VIII, pp. 91-96, 110)    Dr. Chundru told the jury that his exam showed that the complainant was suffering from acute pneumonia.   He told the jury that pneumonia is typically caused by broken ribs, chronic obstructive pulmonary disease (COPD), cancer or some types of drugs (not heroin).   He also testified that a toxicology report showed the presence of morphine, methamphetamine and promethazine but no indication of heroin.   (R.R. VIII, pp. 97-102)   He testified on cross-examination that none of the drugs found in the complainant's system contributed to her death.   (R.R. VIII, p. 106)   He concluded his direct examination by testifying that the cause of the complainant's death was complications of blunt force chest injuries.   He testified that a deadly weapon is anything that in the manner of its use is capable of causing death or serious bodily injury.   He further testified that if a person's hands were used to get the decedent to the ground and caused the rib fractures, the hands could be considered a deadly weapon.    Likewise if the arms were used or a body was used, a person's arms or body could be a deadly weapon.   Finally he testified that the ground could be a deadly weapon if a decedent impacted with the ground and was injured by that impact.   (R.R. VIII, pp. 104-105)

The jury heard argument from both sides, deliberated and then

announced its verdict. The jury found appellant guilty of the offense of aggravated assault.[4] (R.R. IX, pp. 5-7; C.R. 141-147)

Appellant elected to go to the jury for punishment. Appellant entered a plea of true to the enhancement allegation. (R.R. IX, pp. 11-12) The State brought forward three witnesses who actually lived with appellant and the complainant in a trailer in Oak Hill for a time. Patrick Thole, testified that he and his wife rented a room in the trailer five years earlier and appellant and the complainant also rented out a room in the trailer. Thole also was a coworker of both appellant and the complainant at Sonic. Thole testified that he witnessed appellant physically abusing the complainant both at work and at home. He described seeing appellant backhand the complainant, lock the complainant in their room, shove her to the ground and drag her around by her hair. He told the jury that appellant was constantly verbally abusive to the complainant. Thole testified that he wanted to intervene but the complainant continuously begged him not to. He also told the jury that he saw appellant steal money from the complainant's purse and he said he saw appellant use crack almost daily. (R.R. IX, pp. 13-24) On cross-examination, Thole admitted that he had

---

[4] Before the charge was submitted to the jury, the State abandoned the language in the indictment regarding a family or dating relationship between appellant and the complainant. (R.R. VIII, p. 163)

pulled a gun on appellant twice, once when appellant broke into his room and another time when appellant had head-butted him. Thole also admitted that he had pulled a knife on appellant one time. This occurred when appellant was coming after him. Thole also told the jury that despite witnessing all this violence by appellant, he never called the police because the complainant asked him not to. (R.R. IX, pp. 24-30)

Thole's wife Michelle also testified about the physical abuse she witnessed by appellant against the complainant. She described witnessing the same kind of abuse as her husband had testified about. She told the jury that she had seen the complainant with a black eye and bruises on her back and upper arms. She also testified that appellant had assaulted her when she tried to intervene in an argument between appellant and her husband. She told the jury that appellant grabbed both of her wrists, pushed her all the way down in the hallway and then pushed her to the floor inside her room. Then appellant closed and locked the door. Michelle told the jury that she had to crawl out of a window in order to get out of her room. She also admitted on cross-examination that she never reported appellant's conduct to police because the complainant did not want her to. (R.R. IX, pp. 30-52)

Dean Johnson, a longtime friend of the complainant's, also lived in

the trailer in Oak Hill.   He also witnessed the physical and verbal abuse of the complainant by appellant.   Johnson testified that on one occasion, when he tried to intervene, appellant headbutted him and knocked him to the floor.   He told the jury that he ended up with two black eyes.   He told the jury that he saw the complainant with bruises on her arms, her face and her neck.   (R.R. IX, pp. 63-80)   Johnson testified that on one occasion, he did call the police on appellant.   When appellant got out of jail a few days later, appellant came to Johnson's door and kicked the door in and threatened to kill Johnson if he ever called the police on appellant again. (R.R. IX, p. 86)

Gabriel Loera, a coworker of both appellant and the complainant at Sonic, also told the jury that he witnessed appellant being both verbally and physically abusive to the complainant.   (R.R. IX, pp. 55-60)

The State also introduced evidence that appellant was in possession of a .22 caliber semi-automatic rifle that had been sawed off at the handle. (State's Exhibit 81)   This was in spite of the fact that as a felon, appellant was prohibited from being in possession of firearms.   Det. Jim Anderson testified that appellant told him that he had fired it once in his backyard when he was arguing with the complainant.   (R.R. IX, pp. 88-92)   Det. Anderson also testified that when he arrested appellant for the aggravated

18

assault of the complainant on February 22, 2013, appellant had methamphetamine in his pocket.    (R.R. IX, p. 96)

The State also introduced evidence that appellant had been investigated in 2006 for hitting another woman, Maria Ortiz, who at the time was holding their child – ████████ Child Protective Services ended up removing the child and placing him in the custody of appellant's mother. From that point on appellant was not allowed to have unsupervised contact with his son.    The evidence also showed that authorities were concerned about the couple's drug use – xanax.        (R.R. X, pp. 7-12)

The State also introduced evidence of appellant's extensive juvenile record.   The evidence showed that appellant was adjudicated for assault with injury and was placed on intensive supervision probation.    That probation was later modified and appellant was committed to the custody of the Texas Youth Commission on the basis of adjudications for assault and burglary of a habitation.    (R.R. X, pp. 13-15, 23-24)   On cross, it was shown that appellant was thirteen when he was adjudicated.    It was also shown that as a child appellant was placed in the state hospital for emotional and mental health issues.    He was diagnosed with conduct disorder. (R.R. X, pp. 24-29)

The mother of another of appellant's children, Christina Mendez,

testified that she met appellant as a pen pal in 2007 when he was in jail. When appellant got out of jail, they continued their relationship. Mendez testified that together they had a daughter ███████ who was six years old at the time of appellant's trial. Mendez testified that she lived with appellant's grandmother but that appellant was only there for a few hours everyday. She told the jury that appellant would push her around and grab her but he never hit her. Mendez testified that she was in a relationship with appellant for three years. (R.R. X, pp. 39-45) The State rested after Mendez's testimony. (R.R. X, p. 93)

During the defense case, several of appellant's aunts testified and told the jury about appellant's upbringing. Isabel Barron told the jury that appellant's mother, ███████ was fourteen years old when she had appellant. Appellant's father was an older man who had no involvement in appellant's life. Barron described appellant as being hyper and suffering from ADD or ADHD as a child. (R.R. X, pp. 97-100) Lira Mickelson, another of appellant's aunts testified that their family was very poor and that there was a lot of physical, verbal and sexual abuse in the home. She testified that her mother would sell appellant's mother, ███, to men on a regular basis beginning when ███ was fourteen until ███ left the house at around eighteen years of age. Mickelson testified that appellant did not

20

function normally as a child – either physically or mentally.   When he was around seven or eight years old, appellant was committed to the Austin State Hospital and stayed there for approximately one year.    After that he was in and out of various institutions.    (R.R. X, pp. 103-110)   Another aunt, Suzie Grossman, also testified about the sexual abuse, emotional abuse, mental and physical abuse that went on in their mother's home.   She too told the jury that appellant's grandmother sold appellant's mother for sex and that appellant's mother got pregnant with appellant when she was fourteen.    And she also testified that appellant was put in the Austin State Hospital at a very young age.    (R.R. X, pp. 116-120)     After the aunts testified, the defense rested and both sides closed.    (R.R. X, p. 122)

After hearing the argument of counsel from both sides, the jury found the enhancement allegation to be true and assessed appellant's punishment at thirty (30) years imprisonment.   (R.R. X, pp. 148-149; C.R. 151-153)

## SUMMARY OF THE ARGUMENT

In his sole point of error, appellant argues that the evidence is insufficient to show that appellant used or exhibited a deadly weapon during the commission of this offense. The indictment alleged that appellant caused bodily injury to the complainant and used or exhibited "a deadly weapon, to wit a hand, an arm, a body, and the ground, which in the manner of its use or intended use was capable of causing death or serious bodily injury." (C.R. 5-6) The State failed to produce affirmative evidence that appellant's hand, arm or body or the ground was used as a deadly weapon in this case. Dr. Chundru, the medical examiner, testified that the cause of death was "complications of blunt force chest injuries" but never specified what those complications were or that a deadly weapon played a part in either the complications or the complainant's injuries. Dr. Chundru never testified that any of the complainant's injuries constituted serious bodily injury. When asked if hands, arms, body could be a deadly weapon, he answered that they could be _if_ any of those things were used to get the decedent to the ground and caused rib fractures. He also testified that the ground could be a deadly weapon _if_ the injuries were caused by the ground and there was an impact in getting the decent to lay on the ground. All of his answers were conditional and not based on the evidence in the case.

22

**THE EVIDENCE IS INSUFFICIENT TO SUPPORT APPELLANT'S CONVICTION FOR AGGRAVATED ASSAULT BECAUSE THERE WAS NO EVIDENCE THAT APPELLANT USED A DEADLY WEAPON.**

Appellant incorporates the Statement of Facts set out earlier in this brief. Appellant was alleged to have committed the offense of aggravated assault by intentionally, knowingly, or recklessly causing bodily injury to the complainant and using or exhibiting a deadly weapon during the assault. V.T.C.A. Penal Code, Sec. 22.01(a)(1); V.T.C.A. Penal Code, Sec. 22.02(a)(2).

The indictment alleged that appellant:

"on or about the 30[th] day of January, 2013, . . . , did then and there intentionally, knowingly, or recklessly cause bodily injury to Nicole McKee, a member of James Palacio's family or household and with whom James Palacio had a dating relationship, by striking Nicole McKee with his hand, and by pushing Nicole McKee with his hand, and by grabbing Nicole McKee with his hand, and by grabbing Nicole with his arm, and by pushing Nicole McKee with his body, and by striking Nicole McKee with his body, and by causing Nicole McKee to fall to the ground, and James Palacio did then and there use or exhibit a deadly weapon, to-wit: a hand, an arm, a body, and the ground, which in the manner of its use or intended use was capable of causing death or serious bodily injury, during the commission of said offense, " (C.R. 5-6)

It was encumbant upon the State to prove beyond a reasonable doubt that either appellant's hand, his arm, his body and/or the ground was a

deadly weapon. Appellant asserts that the State failed to present sufficient evidence that appellant's hand, his arm, his body, or the ground was, in the manner of its use or intended use, capable of causing serious bodily injury or death.

A deadly weapon is anything that in the manner of its use or intended use is capable of causing death or serious bodily injury. V.T.C.A. Penal Code, Sec. 1.07(a)(17)(B). A person's hand, or arm or his body is not manifestly designed to inflict serious bodily injury or death. Nor is the ground. See V.T.C.A. Penal Code, Sec. 1.07(a)(17). The State therefore was required to prove that appellant's hand, his arm, his body, or the ground in the manner of its use or intended use, was capable of causing death or serious bodily injury. See Thomas v. State, 875 S.W.2d 774, 778 (Tex.App.-Beaumont 1994, pet. ref.) "Serious bodily injury" is "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." V.T.C.A. Penal Code, Sec. 1.07(a)(46).

In determining whether the evidence is legally sufficient to support a deadly weapon finding, the appellate court must review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of aggravated assault

with a deadly weapon beyond a reasonable doubt.  Brooks v. State, 323 S.W.3d 893, 899 (Tex.Cr.App. 2010)(citing Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

The evidence showed that when first responders arrived at appellant's residence, they found the complainant unconscious and in cardiac arrest. Steven Schiller, a City of Austin paramedic, testified that upon examining the complainant, he noticed that she had numerous deep, black-and-blue bruises all over her body.  (R.R. VI, pp. 248-267)  After the complainant was transported to the hospital, appellant agreed to talk with Travis County Sheriff detectives Jim Anderson and Alan Howard at the Travis County Sheriff's Office.  (R.R. VII, pp. 29-34)  Initially appellant told the detectives that the complainant, who was his girlfriend and the mother of one of his children, had arrived at his home three days earlier and she was already bruised.  However, later in the interview he admitted that she had no bruises on her when she arrived at his house.  He admitted grabbing the complainant by her wrists and shoulders in an effort to restrain her to keep her from leaving and getting more heroin (she was a heroin addict.) Appellant told the detectives that the bruises on her forehead were caused when she passed out and fell.  Appellant told the detectives that the bruises on her chest occurred when he tried to restrain her.  He also told the

detectives that at one point while they were struggling, he "bear-hugged" her and they both fell down to the ground and he fell on top of her. He told the detectives that he might have held her too tight but he insisted that he never struck her. (State's Exhibit 5) (R.R. VII, pp. 34-40, 81-82, 87-92) After the interview at the sheriff's office was concluded, the detectives accompanied appellant to his home and he showed them where the events of the previous three days had occurred. As appellant showed them the area by the back door of the trailer house, he recounted how he had been struggling with the complainant when they both fell from the doorway of the trailer to the ground and he landed on top of her. Appellant told Detective Howard that when he fell on top of the complainant, his elbow went up into her chest and appellant said it felt like her ribs moved. Appellant said that it was after this fall that the complainant gasped and began having trouble breathing. (State's Exhibit 20B) (R.R. VII, pp. 92-101; R.R. VIII, pp. 5-7)

At trial, Det. Anderson was asked about deadly weapons. In response to questioning by the State, he testified that based on his training and experience, a hand or an arm, or a body and even the ground, can, in the manner of their use be capable of causing death or serious bodily injury. (R.R. VII, pp. 60-61) On cross-examination, Det. Anderson admitted that

he did not know what caused the bruising on the complainant's arm – arm, hand or ground. He also did not know what caused the injuries to the complainant's head, nor did he know what caused the injuries to the complainant's legs. In fact, he admitted that he did not know how any of the complainant's injuries were caused. (R.R. VII, pp. 71-72)

The evidence showed that the complainant passed away shortly after being taken to the hospital. Dr. Chundru, the medical examiner who performed the autopsy on the complainant, testified that the complainant had recent bruising all over her body. An internal exam revealed that the complainant had rib fractures on both sides of her body. Specifically, there were rib fractures on the left side on rib # 2, 3, 4, 5, 6, 7, 8, 9 and 10 and rib #7 had multiple fractures. The doctor testified that the rib fractures on the victim's left side corresponded with the bruising he found on the exterior of the complainant's body. On the right side, Dr. Chundru found rib fractures on rib # 2, 3 4, 5, 6, 7, 8, and 9. Dr. Chundru testified that some of the anterior rib fractures could have been caused by CPR but CPR would not have caused the posterior rib fractures. Dr. Chundru described the complainant's rib fractures as "pretty severe." And he testified that as a result of the rib fractures, the complainant probably had difficulty breathing and was in a lot of pain. (R.R. VIII, pp. 72-96) Dr. Chundru testified that

his exam showed that the complainant was suffering from pneumonia. He testified that possible causes of pneumonia are broken ribs, chronic obstructive pulmonary disease (COPD), cancer, and some drugs like xanex and morphine (but not heroin.) He also testified that a toxicology report showed the presence of morphine, methamphetamine and promethazine in the complainant's blood. Dr. Chundru testified that he found the cause of the complainant's death to be complications of blunt force chest injuries. (R.R. VIII, pp. 97-104) When asked about the definition of a deadly weapon, Dr. Chundru testified that anything in the manner of its use that is capable of causing death or serious bodily injury is a deadly weapon. He went onto testify that if hands were used to get the decedent to the ground and caused rib fractures, the hands would be a deadly weapon. He also testified that the same could be true of arms or a body. He also testified that the ground could be a deadly weapon if the injuries were caused by the ground and there was an impact in getting the decedent to lay on the ground. (R.R. VIII, pp. 104-105) The State produced no other evidence on the issue of a deadly weapon.

As noted above a deadly weapon is anything that in the manner of its use or intended use is capable of causing death or serious bodily injury. V.T.C.A. Penal Code, Sec. 1.07(a)(17)(B). Applying that definition to the

facts adduced by the State during appellant's trial, it is clear that the State's evidence is lacking.

There was no evidence that appellant's hand, his arm, his body, or the ground caused the complainant's death. Dr. Chundru, the medical examiner testified that the cause of the complainant's death was not the blunt force injuries themselves. Rather the doctor testified:

"A. So the cause of death was complications of blunt force chest injuries." (R.R. VIII, pp. 104) (emphasis added)

After the doctor answered that question, the State never asked the doctor what the complications were and if those complications were caused by appellant's hand, his arm, his body or the ground. Earlier the doctor had noted that the complainant was suffering from acute pneumonia at the time of her death but he never affirmatively testified that the pneumonia was the complication he was referring to, nor did he affirmatively testify that the complainant's pneumonia was a result of the rib fractures. In fact, in response to the State's questioning, he testified that there could be many things that cause pneumonia including drugs like morphine which was found in the complainant's body and which appellant told the detectives he had given to her.

"Q. Are there other causes of pneumonia other than broken ribs?

"A.    Yes.

"Q.    What are the other causes of that?

"A.    Well, some of the natural causes, anyone that smokes a lot or has what we call COPD, chronic obstructive pulmonary disease, they're predisposed to pneumonia. People with cancer, that can obstruct some of the lung, which can cause pneumonia.    Sometimes drugs can cause pneumonia.

"Q.    What kind of drugs would cause pneumonia?

"A.    Typically what we're talking about is respiratory depressant drugs like Xanax, opioids like Morphine things like that."    (R.R. VIII, p. 99)

Dr. Chundru went on to testify that a toxicology report done on the complainant showed that at the time of her death she had morphine, methamphetamine and promethazine in her body.   (R.R. VIII, p. 102)

Likewise there was no evidence that any of the injuries suffered by the complainant (including the rib fractures) would be considered "serious bodily injury."    The State never asked the doctor if the complainant's injuries could be considered "serious bodily injury."    The closest the doctor came to labeling the degree of the complainant's injuries was when he was asked the following:

"Q.    And in looking at the pictures and having performed the autopsy on Ms. McKee, on a scale of one to 10 how would you rate the severity of her injuries?

"A.    She has quite a few rib fractures and so those are

30

pretty severe." (R.R. VIII, p. 96) (emphasis added)

Dr. Chundru never classified any of the injuries suffered by the complainant as "serious bodily injury." And the State adduced no other evidence to show that any of the injuries suffered by the complainant would be considered to be serious bodily injury. Accord <u>Villarreal v. State</u>, 716 S.W.2d 651 (Tex.App.-Corpus Christi 1986, no pet.)(where evidence insufficient to show that rib fractures constituted either a substantial risk of death or serious bodily injury.)

Here, the State failed to adduce evidence that appellant's hand, his arm, his body, or the ground was, in the manner of its actual use or intended use, capable of causing serious bodily injury or death. This point of error should be sustained.

.

## **PRAYER**

Appellant respectfully requests that this Honorable Court sustain his point of error and reverse the trial court and enter an order of acquittal.

Respectfully submitted,

/s/ Linda Icenhauer-Ramirez
LINDA ICENHAUER-RAMIREZ
Attorney at Law
1103 Nueces
Austin, Texas 78701
(512) 477-7991
FAX: (512) 477-3580
SBN: 10382944
Email: ljir@aol.com

ATTORNEY FOR APPELLANT

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief was computer generated and contains 6,438 words, as calculated by the word count function on my computer.

/s/ Linda Icenhauer-Ramirez
LINDA ICENHAUER-RAMIREZ

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Appellant's Brief on Original Appeal was served by e-service to the Travis County District Attorney's Office on this the 20th day of July, 2015.

/s/ Linda Icenhauer-Ramirez
LINDA ICENHAUER-RAMIREZ